IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

DUANE E. LEE, )
*on behalf of Jacqueline K. Lee,* )
)
Plaintiff, )
)
v. ) Civil Action No. 1:14cv0644 (LMB/JFA)
)
CAROLYN W. COLVIN, )
Acting Commissioner, )
Social Security Administration, )
)
Defendant. )
_____ )

## REPORT AND RECOMMENDATION

This matter is before the undersigned magistrate judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment. (Docket nos. 11, 13).[1] Pursuant to 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final decision of Carolyn W. Colvin, Acting Commissioner of the Social Security Administration ("Commissioner"), denying plaintiff's claim for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act. The Commissioner's final decision is based on a finding by the Administrative Law Judge ("ALJ") and Appeals Council for the Office of Disability and Adjudication and Review ("Appeals Council") that claimant was not disabled as defined by the Social Security Act and applicable regulations.[2]

---

[1] The Administrative Record ("AR") in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C). (Docket no. 7). In accordance with these rules, this Report and Recommendation excludes any personal identifiers such as claimant's social security number and her date of birth (except for the month and year of birth) and the discussion of claimant's medical information is limited to the extent necessary to analyze the case.

[2] On December 9, 2013, Jacqueline K. Lee passed away while her claim was pending before the Appeals Council. (AR 1135). Duane E. Lee, as claimant's spouse and executor of her estate, properly substituted himself as a party to her claim for DIB. (AR 7). Unless otherwise indicated, all references to "plaintiff" are intended to refer to the substituted party Duane E. Lee and all references to "claimant" are intended to refer to decedent Jacqueline K. Lee.

Both parties filed motions for summary judgment (Docket nos. 11, 13), along with briefs in support (Docket nos. 12, 14), which are now ready for resolution. For the reasons discussed below, the undersigned recommends that plaintiff's motion for summary judgment (Docket no. 13) be denied; the Commissioner's motion for summary judgment (Docket no. 11) be granted; and the Commissioner's final decision be affirmed.

## I. PROCEDURAL BACKGROUND

Claimant filed her application for DIB on April 7, 2011, alleging a disability onset date of March 30, 2011.[3] In her application claimant cited several conditions, including: lupus, arthritis, skin rashes, depression, anxiety, kidney problems, migraines, and chronic back, knee, and hand pain. (AR 59). Claimant's application was denied initially and on reconsideration. (AR 95–99, 104–106).

Following claimant's request for a hearing before an ALJ on June 20, 2012 (AR 111–12), a hearing was held before ALJ Eugene Bond on February 12, 2013 (AR 43–58). On March 21, 2013, the ALJ issued a decision, finding that claimant was not disabled under sections 216(i) and 223(d) of the Social Security Act. (AR 24–37). Claimant requested review of the ALJ's decision on April 5, 2013. (AR 19–20). During the pendency of this review, the Appeals Council sent a letter to the Social Security Office, stating: "We have been notified that the claimant died on December 19, 2013. In order to proceed with the case, the Appeals Council needs information as to whether there is an adversely affected party who wishes to continue the action." (AR 12). On January 28, 2014, Duane E. Lee submitted a request to be designated as a substitute party as claimant's surviving spouse. (AR 7).

---

[3] As shown in the Administrative Record, claimant's first contact with the Social Security Administration occurred in February 2011, while she was working part time, allegedly as a result of her medical conditions. (AR 190–205). After she was terminated from her employment on March 30, 2011, she filed her DIB claim.

The Appeals Council denied plaintiff's request for review on March 28, 2014. (AR 1–5). As a result of this denial, the ALJ's decision became the final decision of the Commissioner. On May 30, 2014, plaintiff filed this action seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). (Docket no. 1). Pursuant to the court's August 13, 2014 Order (Docket no. 8), this case is now before the court on the parties' cross-motions for summary judgment (Docket nos. 11, 13).

## II. STANDARD OF REVIEW

Under the Social Security Act, the court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hays*, 907 F.2d at 1456 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). While the standard is high, where the ALJ's determination is not supported by substantial evidence on the record, or where the ALJ has made an error of law, the district court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

In determining whether the Commissioner's decision is supported by substantial evidence, the court must examine the record as a whole, but it may not "undertake to re-weigh the conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (alteration in original) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *See*

3

*Perales*, 402 U.S. at 390. Moreover, the Commissioner is charged with evaluating the medical evidence and assessing symptoms, signs, and medical findings to determine the functional capacity of the claimant. *See Hays*, 907 F.2d at 1456–57. Overall, if the Commissioner's resolution of the conflicts in the evidence is supported by substantial evidence, the district court is to affirm the Commissioner's final decision. *See Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

## III. FACTUAL BACKGROUND

### A. Claimant's Age, Education, and Employment History

Claimant was born in 1970. (AR 906). Claimant was a high school graduate and attended college for two years before leaving college to take care of her children and grandmother. (AR 907). Claimant held several jobs after high school, including a hospital clerk/secretary, meeting assistant, meeting coordinator, and conference manager. (*Id.*). Plaintiff alleges that claimant was rendered incapable of working beginning March 30, 2011 when she was terminated from her most recent job based on her inability to travel and perform assigned duties. (AR 48, 647). Claimant did not look for or resume work after March 30, 2011. (AR 48). Claimant was forty-two years old at the time of the ALJ's decision.

### B. Summary of Claimant's Medical History[4]

In her April 2011 DIB application, claimant claimed disability based on the following illnesses, injuries, or conditions: lupus, arthritis, skin rashes, depression, anxiety, kidney problems, migraines, and chronic back, knee, and hand pain. (AR 59).

Beginning in May 2008, claimant began a series of orthopaedic evaluations for pain in her left knee. (AR 1110). An initial physical evaluation and x-rays of the knee on May 8, 2008

---

[4] The Administrative Record contains almost 1000 pages of medical records from various sources relating to claimant's medical treatments. This summary provides an overview of claimant's medical treatments and conditions relevant to her disability claim and is not intended to be an exhaustive list of each and every medical treatment.

4

showed no significant acute fracture, dislocation, or radiologic abnormal finding. (AR 1110–11). On October 27, 2008, claimant returned for re-examination due to recurrent left knee pain. (AR 1106). A physical examination revealed mild effusion in the left knee and major tenderness in the medial joint line and medial femoral condyle. (*Id.*). Claimant was advised to take pain medication and use a cane. (*Id.*). An MRI taken in 2008 showed no significant major structural damage to the menisci or ligaments but did reveal some degree of signal change in the patellofemoral joint and mild effusion. (AR 1108).

In September 2008, claimant was diagnosed with menorrhagia and underwent a hysteroscopy, dilation, and curettage on September 5, 2008. (AR 350, 353). Claimant was to avoid any lifting or carrying of heavy objects until after her follow up appointment on September 18, 2008. (AR 476). No evidence was presented regarding any complications from this procedure.

Claimant was admitted to the hospital on September 6, 2010 after complaining of left-sided chest pain and shortness of breath. (AR 375). A chest x-ray and EKG were negative for significant abnormalities. (AR 376). A two-day stress test was performed which was unremarkable and showed no ischemia. (AR 373). Claimant also complained of abdominal pain and migraine headaches. (*Id.*). CT scans performed on the brain and abdomen revealed no significant abnormalities. (AR 379–80). Prior to claimant's discharge, additional tests revealed a urinary tract infection, which was addressed with medication. (AR 373).

On September 21, 2010, x-rays of claimant's spine revealed mild degenerative changes of the lumbosacral junction and mild grade 1 retrolisthesis of L5 on S1. (AR 431). On September 30, 2010, claimant's internist noted that claimant suffered from back pain due to arthritis and recommended that she work from home pending further evaluation. (AR 430). In October 2010,

5

claimant received an orthopaedic consultation after continuing to experience lower back and

right buttock pain after her discharge from the hospital. (AR 404). Prior to this consultation,

claimant attempted to address the pain with medication and two weeks of physical therapy. (*Id.*).

Claimant denied numbness, weakness, or tingling, but stated that the pain disturbed her sleep and

that sitting often exacerbated the pain. (*Id.*). A physical examination of the claimant recorded

her height at 5'5" and her weight at 270, resulting in a BMI of 45. (AR 405). Claimant

maintained full passive and active range of motion in her extremities, although claimant had

moderate upper lumbar and right S1 joint tenderness with range of motion restricted to 75% with

extension. (AR 405–06). There was no evidence of muscle atrophy. (*Id.*). Claimant was given

a referral for an MRI of the lumbar spine and was advised to return for a second consultation.

(AR 406). An MRI of the lumbar spine conducted on October 13, 2010 was negative.[5] (AR 409,

448). Claimant was advised that the pain could be attributed to referred pain from the kidneys,

resulting from her urinary tract infection and that she should follow up with a specialist. (AR

408).

In November 2010, claimant received a neurological consultation after experiencing

lower back pain, headaches, and tremors in her hands. (AR 446). Claimant complained of

constant lower back pain which no longer radiated to her right side, but instead into her left

buttock, thigh, and calf area, with aggravated symptoms during prolonged periods of walking

and sitting. (*Id.*). Claimant also complained of tingling and twitching in her left arm and leg,

occurring three to five days per week. (*Id.*). The attending physician noted lumbosacral

tenderness with decreased range of motion continuous with lower thoracic tenderness; claimant

---

[5] Specific findings of the MRI include: "There is normal lumbar lordosis. The vertebral bodies are normally aligned. The vertebral bodies are normal in height, configuration, and signal intensity. The intervertebral disc spaces are preserved. There is no evidence of disc bulge or herniation. The central canal and neural foramina are maintained. There is no evidence of epidural disease. The conus is normal in configuration and signal intensity ending at L1. There are no paraspinal masses or collections. (AR 409).

also tested positive during a straight left leg raise. (AR 447). Given claimant's complaints of severe lumbosacral pain and noting that the recent MRI of claimant's lumbar spine revealed mild degenerative changes but no disc herniation or lumbosacral stenosis, the attending physician opined that claimant may have lumbosacral radiculopathy or nerve root impingement and recommended nerve conduction studies and electromyography of the lower extremities for a more accurate diagnosis. (AR 448). Claimant was also scheduled to undergo an MRI of the brain to rule out any significant central nervous system abnormality as a cause of her headaches. (AR 449). The attending physician noted that claimant's symptoms prevented her from attending work and recommended that she continue to work from home until the completion of further testing. (*Id.*).

The MRIs of claimant's brain conducted on November 13, 2010 were unremarkable. (AR 572). Results obtained from an electroencephalogram conducted on November 22, 2010 were normal. (AR 443). Nerve conduction studies on November 22, 2010 revealed good strength and symmetrical reflexes in both upper extremities. (AR 450–51). Additional nerve conduction studies on November 23, 2010 revealed a tender lumbosacral spine and good strength in both lower extremities. (AR 452–53). On November 26, 2010, a retroperitoneal ultrasound revealed a normal appearance of claimant's kidneys and bladder. (AR 574–75).

On November 24, 2010, after consulting with her neurologist, claimant returned to her orthopaedist for another appointment to assess recurring left knee pain. (AR 1116). X-rays showed no significant radiologic abnormal finding. (*Id.*). The orthopaedist saw no major problems other than diffuse inflammatory pain from the patellofemoral joint. (AR 1118). Claimant was not placed on any medications at this time, but was advised that an injection of

7

corticosteroid may be a future treatment option as claimant responded well to this treatment option in 2008. (AR 1116, 1118).

On November 10, 2010, claimant was seen by Dr. Alan Moshell, a dermatologist, for possible systemic lupus erythematosus ("SLE") because of "kidney disease and joint pains." (AR 439). Dr. Moshell noted erythema with minimal scale of the cheeks and bridge of nose. (*Id.*). His initial impression was SLE but indicated further lab results should be considered. (*Id.*). He prescribed a cream to be applied to the rash. (*Id.*). In a December 15, 2010 follow up visit, Dr. Moshell noted that the erythema had decreased and his impression at that time was that the rash was more likely subdermal and not a manifestation of SLE. (AR 438).

On December 27, 2010, claimant had her initial examination at the Washington Hospital Center ("WHC") Department of Rheumatology. (AR 613–17). Drs. Weinstein and Singh noted that even though claimant had more than four clinical criteria for SLE, the testing for autoimmune disease was negative and claimant's rashes were not consistent with those typically presenting with SLE. (AR 615–16). Claimant was prescribed Plaquenil (a typical treatment for SLE) to see if it improved her symptoms. (AR 616). On March 14, 2011, Dr. Orlowski noted that claimant's skin rash had improved and that she has a "confusing history of malar rash and joint pains but work up to date has not demonstrated serologic evidence of SLE." (AR 610–11).

Treatment records from a February 10, 2011 session with her neurologist indicate that claimant reported that her dermatologist had diagnosed her with lupus. (AR 440). During this appointment, claimant stated that she was recently prescribed medication for depression and panic attacks by her primary care physician and continued to have lower back pain on a daily basis. (*Id.*). Claimant also stated that she experiences knee pain, which she treats with prescription medication. (*Id.*). The attending physician also noted that while claimant continued

8

to have headaches, they have improved slightly with medication. (AR 441). Impressions included degenerative disc disease/degenerative joint disease of the lumbar spine with complaints of radicular pain on claimant's left side, migraine headaches, nocturnal twitches (benign myoclonus), and lupus. (*Id.*).

On March 22, 2011, claimant met with an urogynecology specialist after experiencing urinary urgency and hematuria. (AR 456–62). After a physical examination, claimant was diagnosed with chronic cystitis, hematuria, dysuria, urge incontinence, urgency of urination, and nocturia. (AR 460). Claimant was prescribed antibiotics, which resolved urinary urgency. (AR 460, 463). On April 27, 2011 claimant returned for a follow up urodynamic screening and cystoscopy which produced no significant results. (AR 463–66).

On April 12, 2011 an optometrist—upon examining the claimant—found that she had narrow anterior chamber angles with visual acuity of 20/20- OD and 20/25+ OS. (AR 559–61). While claimant was not at increased risk for glaucoma at the present time, it was recommended that she be monitored closely given her optic nerve elongation and thin corneas. (AR 561). Claimant was scheduled to return for a follow up gonioscopy in three months. (*Id.*). Subsequent treatment records do not document significant deterioration in the claimant's vision.

Another abdominal and pelvic CT scan was taken on May 19, 2011 and the results were unremarkable with a normal appearance of the kidneys, uterus, and bladder. (AR 570). The radiology report also notes surgical clips present around the stomach and attributes this to a gastric bypass procedure claimant underwent in 2001. (*Id.*). On May 23, 2011, claimant was referred to Dr. Shope for her continuing complaints of abdominal pain. (AR 597). Following his examination, Dr. Shope recommended admission, lab studies, possible imaging, and likely operation for the abdominal pain to address issues relating to claimant's previous bariatric

surgery in 2001. (AR 597, 600–01).  On May 24, 2011, claimant underwent a revision of jejunojejunostomy by Dr. Shope (AR 784) and on June 6, 2011 claimant was readmitted given her nausea, need for wound care, and tachycardia (AR 798–801).  A June 20, 2011 follow up visit revealed the claimant was doing well. (AR 802–05).  Subsequent follow up visits indicated claimant was suffering from malnutrition due to surgery. (AR 770, 776, 782).

On July 19, 2011, Catherine Chapman, a nurse practitioner for Dr. Mbualungu at WHC, submitted a mental status evaluation of the claimant. (AR 763).  On that form Nurse Chapman indicates that the claimant was diagnosed with SLE, chronic pain, depression, generalized anxiety disorder, osteoarthritis, migraines, and chronic cystitis.  (Id.).  The evaluation also notes that claimant was unable to work due to her multiple medical conditions.  (Id.).  Claimant's orientation, speech, cognition, memory, attention/concentration, thought (flow and content), and judgment were all within normal limits.  (Id.).  Claimant demonstrated an ability to appropriately relate to others and was capable of managing her own funds.  (Id.).

On August 3, 2011, Nurse Chapman completed a range of motion form for the claimant. (AR 762).  The evaluation form notes that claimant experienced pain and restricted range of motion in her knees and thoracolumbar spine.  (Id.).  Claimant was also ambulating with the assistance of a cane.  (Id.).  The form notes normal range of motion for the cervical spine, shoulders, elbows, hips, ankles, and wrists.  (Id.).

On October 17, 2011, claimant returned for another consultation with a urogynecology specialist.  (AR 833).  Claimant complained of left flank pain radiating into the left groin area and was diagnosed with hematuria, dysuria, elevated urinary oxalate, urge incontinence, urgency of urination, and nocturia.  (AR 833–34).  Claimant had been informed by her nephrologist, Dr. Orlowski, about the high oxalate levels in her urine and was directed to follow a low oxalate diet

10

and increase fluid intake. (AR 833). Claimant was examined and advised to follow up with a stone protocol CT scan. (AR 834–35).

On November 11, 2011, claimant began complaining of upper thoracic pain. (AR 1117). X-rays of the cervical spine showed mild disc degeneration C4/5. (*Id.*). Claimant was placed on a physical therapy regimen and prescribed an anti-inflammatory. (*Id.*). On February 3, 2012, claimant returned for a follow up appointment regarding pain in her right knee. (AR 1103). A physical examination revealed some improvement based on treatment with certain prescriptions. (*Id.*). On March 16, 2012, claimant returned, complaining of left knee pain. (AR 1102). A physical examination revealed nothing significant, but an MRI was ordered in order to rule out any structural damage. (*Id.*). An MRI of claimant's left knee on April 11, 2012 revealed a focal region of full thickness chondral delamination and flap formation at the medial trochlea. (AR 819–20). There was also mild patellofemoral dysplasia, moderate sized joint effusion, and mild reactive synovitis. (AR 820). On April 13, 2012 claimant returned to discuss aspiration and injection treatment options. (AR 1098). Claimant stated that she wanted to continue on her current treatment plan, but would return in three weeks for re-examination in order to determine if effusion is still significant. (*Id.*).

On December 12, 2011 claimant was admitted to the hospital after complaints of chest pain and shortness of breath. (AR 823). An initial EKG showed nothing significant and upon evaluation the next morning, claimant showed no symptoms of cardiac pain or complications. (AR 824). An x-ray of the chest confirmed that there were no abnormalities in either the chest cavity or the lungs. (AR 826). On December 13, 2011 a cardiac stress test was performed. (AR 827). Although terminated due to fatigue, the stress test showed no ischemic changes and no chest pain. (*Id.*). On January 11, 2012, claimant was evaluated by a pulmonary internist for her

complaints of shortness of breath. (AR 830). A physical evaluation was unremarkable. (AR 830–31). A pulmonary function test showed a restrictive defect with an excellent response to bronchodilators. (AR 831). Claimant was prescribed an inhaler to resolve her asthma and shortness of breath. (*Id.*).

In a subsequent follow up appointment on February 13, 2012, Nurse Chapman noted that claimant's back pain had improved since taking Celebrex and that she had noted improvement in her asthma since receiving the medication following her pulmonary evaluation. (AR 822).

On September 19, 2012, an upper GI with small bowel series test was performed following claimant's bariatric surgery. (AR 1131). Images displayed an unremarkable gastric pouch and no significant abnormalities in the small bowel. (*Id.*). On October 25, 2012, claimant underwent a diagnostic laparoscopy and a right salpingectomy. (AR 1128).

On December 10, 2012 claimant returned for another orthopaedic evaluation related to upper thoracic pain and right shoulder pain. (AR 1095). Claimant stated that pain increased with "above head" activities and the majority of the pain was in the right side of her shoulder. (*Id.*). A physical examination of the right should and cervical spine was unremarkable with claimant maintaining full range of motion. (*Id.*). Physical therapy was recommended and an injection was made into the right shoulder. (AR 1096). Claimant agreed to return for more definitive treatment options if the pain persisted. (*Id.*).

On December 12, 2012 claimant underwent an upper GI endoscopy. (AR 1120). The results revealed normal gastric bypass surgery anatomy and were otherwise unremarkable. (*Id.*).

### C. ALJ's Decision dated March 21, 2013

In every Social Security disability claim analysis, the ALJ is required to employ a five-step sequential evaluation to determine the claimant's eligibility, and it is this process that the

court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence in the record. *See* 20 C.F.R. §§ 404.1520, 416.920. This process requires the Commissioner to consider, in sequence, whether a claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment and is thus considered *per se* disabling; (4) can return to her past relevant work; and (5) if unable to return to her past relevant work, whether she can perform other work that exists in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520.

Here, the ALJ made the following findings of fact: (1) claimant met the insured status requirements of the Social Security Act through December 31, 2014 (AR 26); (2) claimant had not engaged in substantial gainful activity since March 30, 2011, the alleged onset date (*Id.*); (3) claimant had the following medically determinable impairments: systemic lupus erythematosus, a back disorder, a knee disorder, a kidney disorder, obesity, migraine headaches, glaucoma, asthma/sleep-related breathing disorder, hypertension, and depression (*Id.*); (4) claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, App. 1 (AR 30); (5) claimant had the residual functioning capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) except claimant could only perform simple, unskilled work activities that allowed her to alternate sitting and standing at will (AR 33); (6) claimant was unable to perform any past relevant work (AR. 35); (7) claimant was 40 years old on the alleged disability onset date, which is defined as a younger individual age 18–49 under 20 C.F.R. § 404.1563 (*Id.*); (8) claimant had at least a high school education and was able to communicate in English (AR 36); (9) transferability of job skills was not material to the determination of disability because the

13

Medical-Vocational Rules supported a finding that the claimant was not disabled, whether or not the claimant had transferable job skills (*Id.*); (10) claimant did not have an impairment that prevented her from obtaining substantial gainful employment because there were jobs that existed in significant numbers in the national economy that claimant could have performed (*Id.*); and (11) claimant had not been under a disability as defined in the Social Security Act, from March 30, 2011 through March 21, 2013, the date of the ALJ's decision (AR 37).

## IV. ANALYSIS

### A. Overview

In the complaint, plaintiff challenges the Commissioner's final decision as one that is not supported by substantial evidence and applies an erroneous standard of law. (Docket no. 1). Plaintiff later clarified this argument in the memorandum in support of plaintiff's motion for summary judgment (Docket no. 14), first stating that: "The factual determinations made by Administrative Law Judge (hereinafter ALJ) Eugene Bond of the Social Security Administration who decided the disability case for Jacqueline K. Lee, were not supported by 'substantial evidence.'" (Docket no. 14 at 1). Plaintiff then attacks the Commissioner's final decision on more specific grounds, arguing that claimant met the listing for systemic lupus erythematosus (Listing 14.02) and that the ALJ failed to adhere to the required listing analysis when deciding her claim for DIB. (*Id.* at 2, 7–9); *see* 20 C.F.R. § 404, Subpart P, App. 1. Lastly, plaintiff argues that the Appeals Council erred when it failed to remand the claim to the ALJ after receiving a death certificate stating claimant died due to or as a consequence of SLE. (Docket no. 14 at 10); (AR 1135).

The overarching issue before this court is whether there is substantial evidence in the record to support the Commissioner's final decision that claimant was not disabled within the

meaning of Title II of the Social Security Act on or before March 21, 2013, and whether the Commissioner—acting through the ALJ—applied the correct legal standards in reaching that decision.

## B. The ALJ's Decision is Supported by Substantial Evidence

As noted in the memorandum of law in support of defendant's motion for summary judgment (Docket no. 12), plaintiff's generalized allegation with respect to a lack of substantial evidence and the application of an erroneous standard of law does not lend itself to particularized rebuttal arguments in support of the ALJ's findings. Defendant addressed this issue by arguing in support of the ALJ's final determination that claimant had the RFC to perform substantial gainful activity consistent with her limitations. (Docket no. 12 at 8). Defendant's opposition to plaintiff's motion for summary judgment focuses on the argument asserted by the plaintiff in his motion for summary judgment that the ALJ erred in finding that the claimant did not meet Listing 14.02 for SLE in step three of the required five-step analysis.[6] (Docket no. 17). A discussion of each step of the five-step analysis undertaken by the ALJ follows.

With respect to step one of the analysis, the parties agree that the claimant did not engage in substantial gainful activity since March 30, 2011, the alleged onset date. (AR 26). In step two, while the ALJ found "no convincing evidence of the claimant having any impairment, (or combination of impairments), which is 'severe' within the meaning of the regulations," the ALJ nevertheless continued to steps three, four, and five "in an effort the give the claimant the benefit of every doubt." (AR 30). Recognizing that the DDS medical consultants found that certain impairments alleged by claimant resulted in significant physical and mental limitations, the ALJ

---

[6] Defendant filed a motion for summary judgment on September 26, 2014 (Docket no. 11) and in accordance with the order entered on September 10, 2014 (Docket no. 10), plaintiff's opposition to defendant's motion for summary judgment was due on October 10, 2014. While defendant did file an opposition to the plaintiff's motion for summary judgment (Docket no. 17), plaintiff did not file an opposition to the defendant's motion for summary judgment.

assumed claimant's lupus, back disorder, knee disorder, migraine headaches, obesity, and depression were "severe" within the meaning of the regulations. (*Id.*). Accordingly, claimant cannot successfully allege any error at this step in the analysis, given that the ALJ assumed that these impairments were severe and proceeded onward.

In considering step three of the sequential evaluation process, the ALJ concluded that the claimant did not suffer from an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart 1, App. 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. The ALJ specifically addressed: major joint dysfunction (Listing 1.02); disorder of the spine (Listing 1.04); impaired renal function (Listing 6.02); neurological disorders (Listing 11.01); mental impairment (Listings 12.02, 12.04, 12.06); and obesity.[7] (AR 30–32).

After step three, but before determining whether the claimant was capable of performing past relevant work, the ALJ determined claimant's RFC. *See* 20 C.F.R. §§ 416.920(e)–(f), 416.945(a)(1). Following an exhaustive review of claimant's medical history, the ALJ determined that while the available medical records were consistent with some medical impairments, the evidence did not support the degree of limitations alleged by the claimant. (AR 33–35). Therefore, the ALJ determined that claimant had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except that claimant would be limited to performing simple, unskilled work activities that allowed her to alternate sitting and standing at will. (AR 33).

In finding that claimant was limited to unskilled work activities, the ALJ determined in step four that claimant was unable to perform her past relevant work, as claimant's prior employment required her to perform some skilled work activities. (AR 35). However, testimony

---

[7] ALJs are required to consider obesity in determining whether claimants have medically determinable impairments that are severe and whether those impairments meet or medically equal any listing. ALJs are also required to consider obesity when determining a claimant's residual functional capacity. *See* Social Security Ruling 02-1p.

elicited from the vocational expert indicated that an individual of claimant's age, education, and work experience would be able to perform light/unskilled work with a sit/stand option and that there were existing positions in significant numbers in the national economy. (AR 36–37).

In determining whether substantial evidence exists, the court is required to examine the record as a whole, but it may not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (second alteration in original) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)) (internal quotation marks omitted). Recognizing that it is solely the ALJ's duty to resolve conflicting medical evidence, the undersigned recommends a finding that the Commissioner's final decision is supported by substantial evidence. *See Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996). While a review of claimant's medical records reveals a history of recurring joint pain and discomfort in addition to urinary problems, migraines, and generalized anxiety disorder, these records also reflect several repeated instances of negative and/or mild test results. In several instances, claimant's subjective evaluation of her pain and symptoms do not track the objective medical evaluations. Based on the evidence, the ALJ made a reasonable determination that while the medical evidence confirmed that the claimant suffered from various impairments, the treatment records, test results, and reports from treating and examining medical professionals did not support the degree of limitations claimant alleged.

Such a finding necessarily involved a credibility determination made after considering all relevant evidence and testimony. It is well settled that a district court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). This court must accept an ALJ's factual findings and credibility determinations unless "a credibility determination is unreasonable, contradicts other findings of fact, or is based on an

inadequate reason or no reason at all." *Id.* (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)) (internal quotation marks omitted). Additionally, it is well established that claimant's subjective allegations of pain are not conclusive evidence of a disability; rather, the Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

In finding that claimant was not disabled, the ALJ applied the appropriate legal standard and arrived at a reasonable conclusion, supported by substantial evidence. Such a finding does not suggest the claimant was free of pain or discomfort, nor does it suggest that claimant's health problems lacked the ability to impact her daily life. Rather, through an analysis of the medical records and various credibility determinations, the ALJ reasonably concluded that the evidence failed to demonstrate that claimant's condition was of sufficient severity to preclude her from performing any form of substantial gainful employment. Based on the foregoing, the undersigned recommends a finding that the Commissioner's final decision applied the correct legal standard and is supported by substantial evidence.

### C. The ALJ's Failure to Specifically Address Listing 14.02 is Harmless Error

Plaintiff argues that the ALJ erred in failing to apply Social Security Listing 14.02 with respect to claimant's lupus. (Docket no. 14 at 2, 9). Plaintiff asserts that during the hearing before the ALJ, counsel argued that claimant met a listing for systemic lupus erythematosus, which the ALJ then failed to consider in rendering his decision. A review of the hearing transcript (AR 43–58) finds no support for this assertion. During the hearing, counsel argued that claimant's lupus adversely affected the functioning of her joints and only Listing 1.02 was

18

mentioned as applicable to claimant's case. (AR 45–46). Claimant first raised the argument as to Listing 14.02 in her request for review before the Appeals Council. (AR 301–02). There, claimant argued that "the ALJ's failure to even consider this Listing constitutes reversible error." (AR 302). On March 28, 2014, the Appeals Council found no reason to review the ALJ's decision and denied claimant's request for review. (AR 1–6).

The "listings" found in 20 C.F.R. § 404, Subpart P, App. 1 contain descriptions of various physical and mental impairments, organized by the body system they affect. After a claimant proves that they have not engaged in substantial gainful activity and have at least one severe impairment, they may choose to argue that they meet one of these listings. Because the listings are a means by which a claimant can streamline the decision making process, they require satisfaction of more stringent criteria than what is ordinarily required to meet the statutory standard for disability. *See Sullivan v. Zebley*, 493 U.S. 521, 533 (1990). In order for a claimant to show that an impairment matches a listing, "it must meet *all* of the specific medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Zebley*, 493 U.S. at 530 (citing Social Security Ruling 83-19). The burden is placed on the claimant "to show that his impairment matches a listing," and that the condition "meet[s] *all* of the specific medical criteria." *Zebley*, 493 U.S. at 530.

Because the ALJ assumed, for the purpose of continuing with the sequential evaluation process, that claimant's lupus was a "severe" impairment under the regulations, the ALJ should have provided some analysis discussing whether this impairment alone or in combination with other impairments met or medically equaled Listing 14.02. However, the Appeals Council considered this omission and found that nothing provided a basis for changing the ALJ's decision. (AR 1–2, 5).

19

Because the ALJ failed to specifically address Listing 14.02 in his decision, there is no way to determine the basis for the ALJ's decision that "claimant's impairments do not meet or medically equal the requirements of any impairment in 20 CFR Part 404, Subpart P, Appendix 1." (AR 32). However, based on the findings of the ALJ with respect to claimant's history of lupus which was addressed with the use of Plaquenil and medical records documenting "only occasional episodes of joint swelling and ill-defined erythematous patches on her skin, which do not seriously restrict the claimant's ability to lift, carry, walk, stand, push, pull, or carry" (AR 34) the undersigned recommends a finding that the ALJ's failure to specifically address whether claimant's lupus satisfied Listing 14.02 is harmless error. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (holding that even when confronted with error, the district court should affirm the Commissioner's decision if there is "no question ... that he would have reached the same result notwithstanding his initial error"); *see also Ward v. Commissioner*, 211 F.3d 652, 656 (1st Cir. 2000) (holding that remand to correct an error "is not essential" if "it will amount to no more than an empty exercise").

As discussed in detail in the Commissioner's opposition to plaintiff's motion for summary judgment, even if there was a firm diagnosis of lupis,[8] there are no medical findings in the Administrative Record that would support a finding of involvement between lupus and claimant's other ailments. (Docket no. 17 at 3–6). While the medical records support a finding that claimant suffered from osteoarthritis in her back, there is no indication that lupus was the cause of that condition. Furthermore, the plaintiff has not presented sufficient evidence to

---

[8] It is significant that the plaintiff relies on a medical record dated November 10, 2010 for the diagnosis of lupus. (Docket no. 14 at 4). However a review of that medical record (AR 439) and the two subsequent records from that physician (AR 437–38) indicate that claimant's rash was more likely a subdural rash and not SLE. Claimant's rheumatologist performed blood tests to determine whether claimant was suffering from lupus and those tests were negative, which "does not support the diagnosis" of lupus. (AR 615–16).

support a finding of "at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)" as required in Listing 14.02.

### D. Plaintiff Fails to Demonstrate Materiality and Good Cause with Respect to Claimant's Death on December 9, 2013

Plaintiff argues that not only did the ALJ err in ruling that claimant was not disabled, but the Appeals Council erred in failing to remand the claim to the ALJ after receiving notice of claimant's death.[9] Because plaintiff fails to provide any support for why this court should consider additional evidence that falls outside of the administrative review period, the undersigned recommends a finding that the final decision of the Commissioner be affirmed.

42 U.S.C. § 405(g) has been interpreted to generally preclude the district court from reviewing evidence outside the record unless the claimant is able to show "that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." The United States Court of Appeals for the Eighth Circuit has interpreted "material" as "non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied." *See Woolf v. Shalala*, 3 F.3d 1210, 1215 (8th Cir. 1993). Additionally, "it must be reasonably likely that the Commissioner's consideration of this new evidence would have resulted in an award of benefits." *Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997); (citing *Woolf*, 3 F.3d at 1215). The Eight Circuit has also held that "[a]n implicit requirement is that the new evidence pertain to the time period for which benefits are sought, and that it not concern later-acquired disabilities or subsequent deterioration of a previously non-disabling condition." *Jones*, 122 F.3d at 1154 (citing *Goad v. Shalala*, 7 F.3d 1397, 1398 (8th Cir. 1993); *Thomas v. Sullivan*, 928 F.2d 255, 260–61 (8th Cir. 1991)).

---

[9] The Certificate of Death provided in the Administrative Record indicates that the claimant died due to (or as a consequence of) Systemic Lupus Erythematosis.  (AR 1135).

Courts in the Eastern District of Virginia have taken a similar stance under section 405(g), "constru[ing] the term 'good cause' liberally to achieve the remedial purposes of the Social Security Act." *Goff v. Harris*, 502 F. Supp. 1086, 1089 (E.D. Va. 1980). However, when a claimant seeks to have a case remanded, "he bears the burden of showing that the newly discovered evidence bears directly and substantially on the issues decided, that it is not merely cumulative, and that it has a reasonable chance of altering the decision of the [Commissioner]." *Id.* at 1089–90 (citing *Hoss v. Gardner*, 403 F.2d 221 (4th Cir. 1968)). Based on this standard, the undersigned recommends a finding that plaintiff has failed to demonstrate both materiality and good cause with respect to claimant's death. Plaintiff relegates his entire argument to a single sentence in the concluding section of the memorandum in support of his motion for summary judgment. (Docket no. 14 at 10). Plaintiff offers nothing more than a statement that the Appeals Council erred in failing to remand the ALJ's decision based on a statement in the certificate of death without any supporting medical records. (*Id.*). Accordingly, plaintiff has failed to demonstrate both materiality and good cause. To the extent that plaintiff believes claimant's condition deteriorated following the ALJ's decision, he may file a new application for disability on claimant's behalf pursuant to 20 C.F.R. §§ 404.620(a)(2), 416.330(b).

## V. CONCLUSION

Based on the foregoing analysis, it is recommended that the court find that the Commissioner's decision rendered on March 21, 2013 denying benefits for the period March 30, 2011 through the date of the decision, was supported by substantial evidence and that the proper legal standards were applied in evaluating that evidence. Accordingly, the undersigned recommends that plaintiff's motion for summary judgment (Docket no. 13) be denied; the

22

Commissioner's motion for summary judgment (Docket no. 11) be granted; and the final decision of the Commissioner be affirmed.

## NOTICE

Failure to file written objections to this Report and Recommendation within 14 days after being served with a copy of this Report and Recommendation may result in the waiver of any right to a *de novo* review of this Report and Recommendation and such failure shall bar you from attacking on appeal any finding or conclusion accepted and adopted by the District Judge except upon grounds of plain error.

Entered this 3rd day of November, 2014.

_____/s/_____ JFA

John F. Anderson
United States Magistrate Judge
_____
John F. Anderson
United States Magistrate Judge

Alexandria, Virginia

/s/
John F. Anderson
United States Magistrate Judge